Good morning. Good morning, Your Honors. May it please the court, Marisa Larrick Surratt, on behalf of Appellate Lana Johnson, we've reserved four minutes for rebuttal. Your Honor, the events that occurred on Wednesday, June 2nd, 2021 in Asheville, Ohio, present a very unique set of facts for this court to consider in regards to the district court's rulings on the motion to suppress. I would like to first focus on the community caretaker exception, because I think the Supreme Court precedent in Cady v. Dombrowski is clear when it says that as the Supreme Court has explained, the community caretaking function of the police applies only to actions that are totally divorced from the detection, investigation, and acquisition of evidence relating to the violation of a criminal statute. Here, the detective in approaching onto the private property of Miss Johnson did not act with the intent of acting under the community caretaker doctrine. One way it's been put is, is the officer doing something that a neighbor would do? And why isn't that true? In other words, it's hard to know motives and all of that, that gets complicated. But I guess I would have thought that a neighbor, seeing what the officer saw, would have done what happened. And a neighbor would not have called for police backup, but more importantly, a neighbor would not have called for a police canine, a drug sniffing dog, to come to the residence to then have a canine dog alert around the vehicle. The issue here is not with... Maybe I'm misunderstanding or misremembering the sequence, but I thought a key part of the sequence was getting up to see that the individual was overdosed. And that's where things start to go badly for your client. It's true, you could say the officer's trying to help. I think that's a fair thing to say. I mean, a person could have OD'd. From the officer's vantage point, when he first drove past, he did not see anything. First of all, the intent of the officer driving past this residence was the fact that he was performing a drug investigation. Okay, let's stop right there. Do you agree with me that the Fourth Amendment, we analyze it on an objective basis, as opposed to subjectively, what the officers intended or what the officers thought? I think it depends on the scenario. And in here, where we have the statements of the officer during the hearing... I don't know of any Fourth Amendment jurisprudence that applies a subjective standard. I think that's contrary to all precedent. I mean, but that's what you're arguing here, right? That we have to look at the officer's subjective intent. And if their intent was not what a community person would do, that we have to find a Fourth Amendment violation. I don't think that's the law. Maybe I'll ask the other side, if you don't know. Well, here... That's your position. Here, the issue is with the fact that this officer, this detective, knowing that he is under investigation of this residence for drugs, that he called a K-9 officer to perform a drug sniff... Well, that's... Okay, we've got to get him lawfully in position first. And I think he is lawfully in position with the caretaker function, that he sees your client slumped over in the truck. An objectively reasonable person would go there and see if she needs aid, irrespective of subjective intentions or whatever by the officers. So once he's there, then you have to find out, well, is he there too long, or is he still there when he calls... Is he still lawfully on that premises when he calls the dog? Here, I think the scenario is that he goes to take care of her. While he's there, he finds out that she has a misdemeanor arrest warrant out for her. And it's during that time that he's lawfully on the premises that he calls the dog. Isn't that right? No, Your Honors. The dog was... The K-9 was called and backup were called well prior to that. In fact, the K-9 and the assisting officers actually arrived prior to the community care ambulance arriving. So that shows that the priority here was to further his drug investigation, not community care. I want to make sure you're answering... I thought the key part of his question was when the officer gets next to her, was he allowed to be there at that point? Put the dogs, everything else to the side. That's the key point he's asking. From an objective. Exactly. I'll just tell you, you're wrong to look at the subjective intent of the officer. You're just wrong on the law. So objectively, why couldn't he be there to check on her health at that point? Because objectively, the Ms. Johnson herself had told the officer at that point in time that she did not want his help. And so she had declined... She shouldn't have called the ambulance. If the officer... But just, I still think you're not answering his question. So just really listen to what I'm saying. The point, he learns that she's got slurred speech. He learns she's sweating by standing next to her. That doesn't involve conversation. That doesn't involve dogs. It involves nothing else other than where he is. Objectively speaking, could he be standing there to observe that before they talk? Is that true? So what we are dealing with is the essence of him coming onto the private property based upon his observations. And he does admit, the officer admits that based upon the incline of the residents, that he did not have a clear view of who the individual was in the car. But that's why he approached the residents. But what I think is important to distinguish here is prior to him approaching to determine if there's a medical emergency or anything going on, he, knowing, the officer knowing that he's investigating this residence for drugs, calls for a drug detecting canine. And that's the problem. Okay, great. So I think your take on it is that motivation undermines what he did objectively. We'll go look at the case law, but I'm with Judge Griffin. I wouldn't keep barking up that tree for what it's worth. Because the key question is, could he be standing there? And I thought the point was, he's not, he goes by, he sees her in an angle. He can't then see her. 20 minutes later, she's still in the same angle. And that's what leads him to go on the property. That's the question. And so. And I think the facts here are not the intent of the community caretaker doctrine. And as this court has previously stated, with certain things regarding the community caretaker doctrine, it has to be divorced from the investigation. The officer here was not divorced from his criminal investigation into the Johnson. I see, I see what you're saying on this point. I will just tell you there's a lot of these cases, including one I wrote that you're relying on. The officers are almost always in the position they are in to do community caretaking because of some other law enforcement objective. That's just the reality of most of these cases. So you can't quite say the community caretaking doctrine doesn't apply if, for example, the officer's wearing a uniform. The officer has the drug sniffing dog in the car. The offer is on policing a neighborhood where there's suspicion of drugs. That's the fact pattern of almost every one of these cases. So you can keep pushing the point, but I'm just telling you there are a lot of those cases where that's exactly what happened. Okay. I have a couple of facts. I just have a different question. Suppose, you're right, suppose the officer shouldn't have been there. Why does that affect the warrant, which was based on tips that came from others saying distribution was happening at the home and then statements by a third party that there were drugs in the home after she was merandized? Yes, and that brings up the next major point I believe that has been raised and was raised before the district court was after the occupants were removed from the vehicle and much later, as I'm sure the court has watched the videos, the detective orders two of his officers to go up into the residence when there was absolutely no need for a protective sweep. No protective sweep would have been justified under these circumstances. Well, we do have somebody in the house, don't we? Amber Jewell? Your honors, the protective sweep was performed 25 minutes after the protective sweep wasn't appropriate. They went to the door and Amber, that's her name, voluntarily came with the officers to their car. She was merandized. They asked her questions. What were there drugs in the house? She said and that based upon these other tips that came for the reasons they got the warrant. So the district court judge decided to essentially remove the derivative use of the statements of Ms. Jewell because her statements were only obtained after the officers unlawfully entered the residence when there was no justification to do a protective sweep because there was no threat to law enforcement at that time. I believe the detectives were... Okay, wasn't there the possibility that Amber Jewell would destroy the drugs that the officers thought were in the house that she had just brought in the car? Why, I mean, to prevent the destruction of evidence is a reason to do a sweep, is it not? And why isn't that a good grounds? At that point in time, our argument would be that there was no probable cause to search the residence because the two tips that you're discussing, one of which obviously has an error in the time frame, but they are vague time frames and it's vague information. And the fact that the drugs that were ultimately discovered from the purse in the vehicle, there was no evidence that Ms. Johnson had gone in and out of the residence that day. She wasn't prosecuted for those drugs. And she wasn't prosecuted for anything they found on this protective sweep. Yes, so... The search where they found the drugs came because they brought Amber to the car voluntarily and she gave them a statement that there were drugs in the house. I would argue that she was not voluntarily brought there. She was... Do you get to argue that? Because you don't represent her. Well, no, but I represent the Johnsons and that was their residence. And the fact that that came from an unlawful entry into the residence, that's where Ms. Johnson would have standing to argue. I just want to make sure I'm understanding this back and forth. So when the officers enter the residence and then bring her out? Yes. She doesn't voluntarily come out? Correct, Your Honor. She does not voluntarily come out. The officers enter the residence, she is removed by the officers. She does not, they don't knock on the door and say, oh, excuse me, is there anyone here? No, this is not a situation like that. The officers opened the door, stepped in the residence, removed Ms. Jewel from the residence and my clients have standing because it's their residence. Do they see drugs at the time they go in there to get to do the protective suite? They do not seize drugs at that time. Is that part of the affidavit for the search warrant or not? The part of the affidavit for the search warrant is regarding the statements made from Ms. Jewel after the unlawful entry into the residence. Nothing they saw inside the residence? No, I believe it is solely based upon... So your whole theory is it's the fruit of going in there and getting her that taints the search warrant. That's a theory? Yes. By the derivative use, any information gained by law enforcement officers during an illegal search cannot be used in a derivative manner to obtain other evidence, which would be the probable cause for the search warrant here. So my argument would be that there was no probable cause absent the unlawful entry into the residence and as a result, without there being probable cause, the district court erred in denying the defendant's motion to suppress. Thank you. Thank you. Mr. Phillips. May it please the court, Sega Phillips on behalf of the United States. Your honors, this case involves roughly 30-minute interaction in which raises numerous Fourth Amendment questions, but ultimately... Can I just go to the protective sweep just to get a few... So I'm not sure I know the facts on this one point, but when they do the protective sweep, does Amber Jewel come out the door? I mean, in other words, is there really no protective sweep? Or is it true that what counsel just said, that they do go in and then, you know, she comes out with them? But in other words, she gets outside in a but for a way because of the protective sweep. Is that fair? Just to make sure we've got that... Yeah, appellant's counsel is correct. Okay, so next question, just to make sure I'm getting it. You know, there's not really evidence in this case to show the officers were at risk to themselves when it comes to the protective sweep. That seems like a steep climb. So that leaves you destruction of drugs and so forth. And I guess the thing I just, that was for me, the only hard part of this case is, gee, don't you have to have some more serious evidence that they're about... Because I see your theory as really being there's someone in the house, they're involved in the drug distribution, possibly, or some probable cause of that, and they know a police officer's out there. Is that all it takes? Is that, that gets you in protective sweep land every time? No, your honor. I think your honor is correct. That is, this is the hard part of this test. In order to do a protective sweep, two things must be true. First, you must have probable cause, sorry, a protective sweep in order to prevent the destruction of evidence is what I'm referring to here. You must believe that there's probable cause. Okay, so we got that. There is probable cause. There's someone in there. They know about the drugs. They know about the officers. What else do you need? And I feel like I have an instinct there has to be more. Yeah, no, so Sangineto, Sangineto Miranda really puts it in two ways. First is that there's an objectively reasonable belief of probable cause. And second, that there's an objectively reasonable belief that the evidence will be destroyed. That's it. And then that second part of that, the objective reasonableness that the evidence will be destroyed is a two-part test. That is that a reasonable belief that third parties are inside. And second, that an objectively reasonable belief that third parties may soon become aware that the police are investigating. What ratchets it up for you? Is it because Lena Johnson calls inside and says the police are here? Is that the thing that kind of creates the real risk? What are the key facts that help you put it on the side of it's okay? Yeah, for the the police at that point, Detective Plinkus knows that who she's talking to is named Amber because she says Amber. And he testified that she talked to somebody named Amber. Amber told Lester that the police are here. But also at that point, he's learned that Amber was the driver from Akron to Ashtabula County that morning and that she was upstairs. If you look at the clips that were presented right before he orders the sweep for the other officers to secure the residence, that is what is going on. They're talking about Amber. He's asking, where is she? We don't know. Is she upstairs? I don't know where she is. But who told the officer that she was the driver of the car? Lester Johnson told her. I'm sorry, told him, told Detective Plinkus. Okay. Yeah. All right. And so if you look at the... Did the officers break down the door? I'm sorry? Did the officers break down the door? No, I suspected that this was clip three that was presented, submitted to the court. But there's all the evidences that there's body camera of the They walk up the back stairwell. They do open the door. There's some dispute in the transcript about whether a key was used or not. I think red herring and not relevant. The detective opens the door. It looks like he maybe takes two steps in maybe. They're announcing police, anybody in here, please identify yourself. And she walks around the corner and then they take her downstairs. And that's all in clip three that was submitted to the district court and then to this court as well. And so if you look at the two-part test, is there a reasonable belief that somebody is inside the dwelling? Absolutely. That belief is based on both the phone conversation and... Yeah. Anyway, you just think it's as simple as there evidence of drugs in the house. There's a person in there that knows the police are outside. Protective sweeps always justify to prevent destruction of drugs. I don't think it's just that somebody is inside. If it was, for example, a child that was not involved in this at all or some third party not involved in this at all. So alleged co-conspirator of some sort. It's certainly somebody who knows the police are on the trail of this investigation. There's reasonable belief that they're somehow... I mean, you have to show an exigent circumstance. And here, the argument is that it would take too long to go to the courthouse and get a magistrate to issue a search warrant to search the house. That in that time frame that you would get a search warrant, the drugs would likely be destroyed. And all that... That's the argument, right? Yes, Your Honor. And all that exigency allows you to do is secure the premises. It allows you to remove people. It doesn't allow you to do a full search at that because you're planning to get a search warrant, which the detective was planning to get a search warrant at that point. All right. So, okay. So the protective sweep basically... I got you. I want to touch base quickly on the community caretaker. As Your Honors already are aware, the officer was allowed to be where he was at that point. And that's really for three reasons. First of all, the Fourth Amendment doesn't protect all private property. It doesn't protect where this car was parked. The officer does not violate the Fourth Amendment by taking several steps onto an open driveway. The Fourth Amendment by its terms does not protect all land, its houses, its people, its effects, and its papers. It does not protect all land. And this was not part of a house because it wasn't part of the curtilage. Well, I'm not sure I... I mean, you know, if he's doing the caretaking function, I don't think it matters if he goes to the driveway or if he goes to the curtilage of the house. If he sees something in plain view, I mean, I know you make this argument in your brief that you're not in the curtilage and therefore you're not in a protective area. But I don't think that's really material because I think even if Ms. Johnson was in the curtilage, if he saw that, he could go to the curtilage as well. Completely agree with that, Your Honor. I'd rather go that way. Yeah. Anyway, I mean, you agree with me. Fourth Amendment analysis is always objective. It's not subjective. Yes, as you may have heard me say multiple times, the question is objective, reasonable. The officer, objectively, is in a position where he's allowed to, he's got authority, he's checking her out. The scenario is that he calls the ambulance to come. And when does the dog, when is the dog brought in in this scenario? Yeah, the evidence that was presented at the hearing over the two days was that initially he called for two things. He called for backup and an ambulance. It was unclear which one was but they were pretty much together. Backup at that point was not a dog, it was foreseen security is what he refers to. And then what he testifies to is that when he realized that this was likely an overdose, that's when he called for the dog. But it was, again, all of this happened within a very short period of time. Okay, and their argument is the dog came too late. How is he still in a lawful position on the property when the dog gets there? Yeah, so he's there for two reasons. One, she's had, as your honor pointed out, had a warrant out for her arrest and they were waiting to hear. Okay, he's still checking out the warrant when the dog arrives? Yes, yes. They didn't learn that she wasn't going to be brought in on the warrant until they were already had done the protective, until after that point at some point. The detective testified that it usually takes them 20 to 30 minutes to learn this. This was consistent with how long this took. There was no evidence at all that this was prolonged unnecessarily. And again, this gets back to the Fourth Amendment question. They're not anywhere Fourth Amendment protected. They can be there. All right, my last question is they argue that the officer opened the door for the dog. I think your position was it was open, the door was open when the officer approached. Which is the correct? Yeah, I don't actually, in my opposing counsel's defense, I don't think what she's suggesting is that the officers should have closed the door as they did when Lonnie Johnson stepped out of the vehicle, officers opened and closed it. Then the brief suggests that officers were under some obligation to close the driver's side door. There's no dispute, I don't believe, that the driver's side door was open both when Detective Plinkus drove by the first time and saw her, what he thought was leaning over, and then when he drove by 20 minutes later and saw her in the same position. That door was open, it stayed open, stayed open through the dog sniff. And that's where the dog alerted, whipped its head around when it smelled something from the open door. But the officers did not open that door. All right, so how does the officer see that there's something wrong with her eyes? Because slumped over suggests eyes are closed. So he approaches the vehicle with her in the same position after 20 minutes, she starts to stir, she's slurring her speech, she's sweating profusely. She's starting to engage with him so that makes her eyes open. Yes, and that's when she's waving her arm. Yes, your honor. I got it. I think we understand your argument. Thank you. Thank you very much. Thank you. Thank you, honors. Just to touch on one of the things that was just brought up regarding the open and closed door. As if you watch the clips that were submitted to this court that were the government's exhibits, it does show that Lester Johnson was actually sitting in the front passenger seat while community care was there. He was then removed by the detective and asked to go talk near the rear of the vehicle. At that point, the door was never closed, which is what allowed the drug detecting canine when dispatched to enter into the vehicle. Had that illegal entrance not occurred, the canine would not have alerted. So you're saying the police had a duty to close the door? When someone was removed from the vehicle, I would say yes because the law has, not the law, but I would say in a situation like this, not in every scenario, but when someone is removed from a vehicle, the drug detecting canine should have either not been permitted to go in the vehicle or the vehicle should have been secured prior to the canine going around the vehicle because that person was removed by law enforcement. What's the best authority you have for that? Your Honor, I believe with regards to the canine search, it's regarding to the authority cited in my brief regarding the fact that canines should not enter a vehicle during a canine deployment. What's the best scenario that there's a duty to close the door before the canine can sniff around the car? Well, in this situation, it would be making sure that a certain scene is secure for the canine to lawfully perform their job and canines are only permitted to search the exterior part of a vehicle. They're not allowed to go inside. Some of the cases that were cited by the government are cases where a dog jumped into a back of a pickup truck. That's not a closed container. Here, because of the unique scenario presented where Lester Johnson was sitting in the front seat, was removed by law enforcement, and then the canine was deployed, this scenario presents a unique fact of circumstances. At that point, didn't they have reason to arrest Lana? At that point, they decided not to arrest her. They were waiting to determine if she was going to be taken in on a pending arrest warrant. At that point, there was an outstanding warrant for her arrest. And they would still then have to... Oh, I apologize. Well, so they would have an outstanding warrant for her arrest. It would seem odd to them to close the door, I think, to make it harder to arrest her if that's what they want to do. But that's the unique situation presented. Lana Johnson was sitting on the passenger side. That door was closed. So we're referencing the driver's side of the door, which was the side that Mr. Johnson was sitting on, and that's the side that was not closed after he was removed. She was removed from the vehicle and the door was closed, which is part of making sure that the drug detecting canine can do its job when lawfully from closing the door when he got out? He was asked by law enforcement to leave and to go and speak with them. So I think from there, the duty would be more on law enforcement to secure a scene properly prior to having a drug dog being deployed from the situation. He did not voluntarily exit the car. He was asked to exit to go speak with law enforcement during that time. With regards to the probable cause situation of the warrant of getting into the residence, I do want to focus back on some of the facts that these officers, first of all, had had a numerous period of time that had passed prior to ordering this alleged protective sweep, and they did not have any knowledge definitively that anyone was in the house. When watching the body cam videos, there are many statements made that no one else was in the residence, and this was not incident to an arrest. This wasn't a situation where an arrest warrant was being effectuated or even that Ms. Johnson was being taken into custody. A significant period of time had passed, and at that point in time, our argument is there was not probable cause to obtain a search warrant. So they were not trying to preserve an evidence or scene because based upon the vague statements that don't provide evidence, they were not trying to preserve an evidence or scene. I see your time is up. Thank you, Your Honors. On behalf of Ms. Johnson, I would respectfully request this court to reverse the district court's judgment. Okay, thanks to both of you for your helpful arguments. Ms. Serrata, to your court-appointed counsel, thank you very much for your service to the court and to your client. We appreciate it. Thank you. The case will be submitted and the clerk may call the next case.